**GTE DIRECTORIES SERVICE, CORPORATION, a subsidiary of GTE Directories Corporation, a Delaware corporation, and part of GTE Corporation, a Delaware corporation, Plaintiffs,**

v.

**PACIFIC BELL DIRECTORY, a subsidiary of Pacific Bell, a subsidiary of Pacific Telesis Group, a Nevada corporation, Defendants.**

**No. C 90 0404 FMS.**

United States District Court, N.D. California.

March 19, 1991.

Neil Smith and Carol Smith of Limbach, Limbach, and Sutton, San Francisco, Cal., for plaintiffs.

Antony McShane and Floyd Mandell of Katten, Muchin and Zavis, Chicago, Ill., for defendants.

## ORDER RE DISCOVERY

WAYNE D. BRAZIL, United States Magistrate Judge.

The court held a discovery hearing in the above captioned case on March 7, 1991. Having considered the parties' oral and written submissions, and having conducted an *in camera* review of certain documents, the court hereby enters the opinion and the orders that follow.

### Introduction

Plaintiffs' motion to compel raises issues of first impression that have important implications for parties with cases that are assigned to the Early Neutral Evaluation (ENE) program. Their motion also forces the court to confront difficult issues related to invocations of privilege and allegations of waiver.

Before turning to those matters, we report that we have completed the *in camera* inspection of documents ordered by District Judge Smith and have concluded that, absent waiver, those documents are protected by the attorney client privilege.

Plaintiffs argue that even if the privilege might have attached to the documents thus

inspected, the protections otherwise affordable have been waived because certain documents, arguably relating to the same subject matter, were voluntarily produced by defendants in response to a request for production. The documents on which plaintiffs focus in support of their claim of waiver should be divided into two categories. In the first there is only one document: an "Analysis of Search Report" prepared by Anne Hiaring, one of defendant's in-house counsel, for G.H. Genard, defendant's General Attorney. Defendant produced this document, otherwise clearly privileged, in connection with the ENE session in this case, then, later, produced it again in response to plaintiffs' document production demand. The second category of documents consists for the most part of correspondence, with enclosures, from house counsel for defendant to an independent lawyer representing Mr. Richard Wurman, a consultant retained by defendant to help re-design the yellow pages directory. Defendant did not produce the documents in this latter category in connection with the ENE process. Rather, they were disclosed to plaintiffs for the first time in response to a document production demand.

Plaintiffs contend that the production of either category of documents in response to plaintiffs' discovery request is a sufficient predicate for a finding that defendant has waived the protections of attorney-client privilege and/or the work product doctrine with respect to all documents whose contents deal with the subjects alluded to in the disclosed materials. Because the documents in the two categories reached plaintiffs in different ways, and because our analysis is informed by different considerations for the two categories, we consider each separately below.

### Production of the Search Report: ENE and Beyond

■ The "Analysis of Search Report," dated October 30, 1985, clearly is a document that would have been protectable from discovery by the attorney-client privilege (and, perhaps, by the work product doctrine). It is a presumptively confidential communication consisting of the giving of legal advice from one layer of corporate counsel to another (Exhibit A to Plaintiff's Memorandum in Support of Its Motion to Compel Production of Documents, filed January 30, 1990). Plaintiffs' first exposure to this document took place in connection with this court's Early Neutral Evaluation program. Under the rules that govern the ENE program, as set forth in this court's General Order No. 26, the court, counsel, and litigants are required to "treat as confidential all written and oral communications made in connection with or during any early neutral evaluation session." The General Order provides further that "no communication made in connection with or during any early neutral evaluation session" may be "used for any purpose (including impeachment) in any pending or future proceeding in this Court." Paragraph 8, General Order No. 26. It was in this environment of promised confidentiality that the evaluator whom the court assigned to host the ENE session in this case asked Pac Bell to share with him and with plaintiffs several documents, including any trademark search reports that Pac Bell had made. The evaluator asked for these documents because he felt that they would enable him to understand and analyze the case better, and thus to offer more useful inputs to the parties in his role as the neutral. Recognizing that the ENE session was likely to be more productive if the evaluator and plaintiffs had access to the documents thus requested, Pac Bell decided to forward them, but in doing so noted specifically that "the production of these documents [in connection with the ENE process] is not intended to waive the attorney-client or any other privileges which might be asserted by defendant in this action, but is in order to respond to your request and aid in the resolution of this matter." Exhibit 2 to the Declaration of Neil A. Smith in Support of Defendant's Memorandum in Opposition to Plaintiff's Motion to Compel Discovery, filed February 13, 1991.

Appropriately, plaintiffs do not suggest that Pac Bell waived any privilege by pro-

ducing the "Analysis of Search Report" in connection with the ENE session. Since, under General Order No. 26, all communications made or disclosed as part of the ENE process are to remain confidential, no such communication or disclosure may constitute a basis for a finding of a waiver. The capacity of the ENE program to deliver the services it promises [1] would be seriously jeopardized if parties could not communicate frankly about the case and share with the evaluator and their opponents materials or communications that arguably are protected by privilege or the work product doctrine. One key purpose of ENE is to create a setting that permits common sense and frank communication to break through the posturing that can so needlessly increase the cost and delay the disposition of civil litigation. That objective would be much more difficult to achieve if litigants and lawyers had to worry about whether the disclosures or communications they made in connection with the program could be used as bases for claims of waiver. Thus, one goal of the confidentiality provision of General Order No. 26 is to eliminate that fear.

Plaintiffs base their argument that a waiver occurred not on Pac Bell's production of the "Analysis of Search Report" in connection with the ENE program, but on defendant's subsequent production of that document, without any allusion to privilege, in response to a standard document production request made pursuant to Rule 34 of the Federal Rules of Civil Procedure and after the ENE session had been completed. It is not at all clear why Pac Bell produced this document in response to plaintiffs' discovery request. It also is strange that Pac Bell never stamped or otherwise marked the document as confidential or privileged. Counsel for Pac Bell has suggested that his client produced the document in response to the discovery request because Pac Bell knew that plaintiffs already had seen the document in connection with the ENE session and in the belief that Pac Bell's insistence in that setting that it was not waiving its privilege was sufficient to preserve the privilege even as to subsequent productions of the document in response to formal discovery.

With the benefit of hindsight and our own clear vision of the import of General Order No. 26, we find this reasoning curious. In the future, we will find it wholly unpersuasive. Pac Bell knew or should have known that by sharing the document at the ENE session it was not compromising the document's privileged status (as a matter of law) and was not making a waiver. The fact that Pac Bell had shared the document in connection with the ENE session created absolutely no duty in Pac Bell to produce it in discovery. Pac Bell's only obligation was to include the document in its privilege log. But because the issues addressed here have not heretofore been the subject of a ruling from this court there is some reason to excuse the confusion that may have attended Pac Bell's handling of this matter. Knowing that its opponent already had seen the document in question, it was not patently unreasonable for Pac Bell to feel that the appropriate course was to produce the document in response to plaintiffs' discovery request. Given all the circumstances, we conclude that it would not be appropriate to penalize Pac Bell by finding that by producing this document in response to plaintiffs' discovery request Pac Bell waived its privilege with respect to all other communications relating to subjects covered by the search analysis. We hasten to add, however, that this is the only time we will so rule. We now put all counsel and litigants whose cases proceed through the ENE program on notice that we will not accept as an excuse for a subsequent production of a privileged document an argument that the

---

1. The services that ENE is designed to provide include: improved communication across party lines and understanding of issues, isolation of those key disputed matters on whose resolution the outcome of the dispute appears to turn, *identifying facts that can be stipulated, generating a reliable assessment of the relative* strengths and weaknesses of the parties' positions, and developing a plan, including voluntary sharing of information, joint investigations, discovery, and/or motions, under which the case can be positioned as efficiently as possible for fair disposition by settlement or trial.

document earlier had been shared with the opposition in connection with the ENE program. Were we to announce any other rule for future cases we would be creating a real risk that a party might disclose in the ENE setting only those privileged documents that support the positions it is taking in the litigation, then try to use only those documents later in the case, insisting that no waiver had occurred with respect to other documents or communications on the same subject that might be helpful to their opponent. No such selective, self-serving discovery disclosures will be tolerated.

Our comfort with our holding in the case at bar is increased by the fact that Pac Bell has agreed not to assert privilege with respect to the document in question and to produce any other documents that reflect relevant trademark search efforts by Pac Bell or on its behalf. Thus, even if the production of the "Analysis of Search Report" was inadvertent or self-consciously tactical, there is little or no risk that the interests of justice would be compromised by the court's refusal to find a waiver reaching other attorney-client communications.

### Production of the Letters to Counsel for Wurman

■ Plaintiffs also assert that defendant's voluntary production of copies of correspondence between its in-house counsel and counsel for a non-party, Richard Wurman, is an independent predicate for a finding that defendant has waived the privilege with respect to all communications related to the subject matter covered by the produced documents. In support of this contention, plaintiffs assert that Mr. Wurman is an "agent" of defendant and that the communications which were disclosed to plaintiffs in the course of pretrial discovery would normally be privileged because of the operation of the "common interest" rule. See, *United States v. Zolin*, 809 F.2d 1411 (9th Cir.1987), *Burlington Industries v. Exxon Corporation*, 65 F.R.D. 26 (1974).

The legal boundaries which define the scope of the "common interest" rule are by

no means well defined. Given the facts of this case, and the elusiveness of the common interest doctrine, reasonable minds could disagree as to whether or not the relationship between Mr. Wurman and the defendants was of a character that would support a conclusion, under that doctrine, that the communications in issue here could have been protected by the attorney-client privilege. For the reasons set forth below, however, we need not resolve this issue.

■ Defendants insist that there can be no waiver of a privilege that never attached. They insist that the privilege never attached to the documents in question, and, therefore, that producing these documents cannot constitute a waiver. Defendants base their argument not primarily on their view about the kind of relationship that must exist between parties to a communication in order to satisfy the common interest doctrine, but on more fundamental requirements of privilege law. Defendants' counsel stated at the hearing on this matter that they reviewed the documents here in issue and decided that no privilege attached to them for the fundamental reason that at the time the communications were made they were not intended to be or to remain confidential. It is axiomatic that no privilege can attach to a communication that was not intended to be confidential. *Zolin, supra*, 809 F.2d at 1417.

■ Having reviewed the relevant documents as to both their form and content, and having considered the proffers by counsel, we are not persuaded that the defendants and/or Mr. Wurman intended that these communications be confidential. While there is some language, in some of the documents, that could lend some support to an inference that defendants might not have wanted the subjects of the communications openly disclosed, taken as a whole, the communications appear to have been made without the intention that they be kept confidential. The words "confidential" or "privileged" or "attorney-client privilege" or "work product" do not appear (by stamp, typed words, or otherwise) on these documents. Nor do the documents contain anything approaching an explicit

request that the recipient treat them as confidential. In the main, they consist of communications from a lawyer for defendant Pac Bell to a wholly independent lawyer for Mr. Wurman, who was not a Pac Bell employee and who was not provided legal representation by Pac Bell. Moreover, with respect to several of the documents it is evident that the author expected counsel for Mr. Wurman to share the content of the enclosures directly with plaintiffs (or their counsel). Thus, the documents that plaintiffs insist could not have been disclosed without waiver consist largely of cover letters whose content appears to us neither especially significant nor especially sensitive. The one arguable exception, the statement in Ms. Hiaring's letter of July 29, 1988, that Pac Bell itself did not want to raise the issue of first use at this juncture, was explained with sufficient plausibility by counsel for Pac Bell during the hearing on this matter. Thus, when we examine the content of these documents, in context, we perceive no substantial reason why their author would feel that it was important to preserve their confidentiality. That fact supports Pac Bell's contention that it did not intend these communications to remain confidential. Because plaintiff has failed to prove[2] that defendant and its counsel intended these communications to be confidential, we find that privilege never attached to them. Because privilege never attached to them, disclosing them cannot constitute a waiver.

Our conclusion is supported by an additional set of considerations. We feel constrained to approach contentions that a party has waived the protections of privilege or the work product doctrine cautiously, resolving doubts against finding waiver. See, *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 157 (1977); *Transamerica*

*Computer Co. v. International Business Machines Corp.*, 573 F.2d 646, 651 (9th Cir.1978); *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 115 F.R.D. 308, 310–312 (1987).

The policy reasons which support a narrow construction of waiver are particularly evident in this case. For example, for a variety of sociological and economic reasons, litigants and their lawyers are frequently disinclined to voluntarily produce information that is clearly relevant to the case at hand. One reason for being so disinclined is the fear that by producing some documents, clearly relevant to the center of the case, the litigant may inadvertently waive the attorney-client privilege as to other, appropriately non-discoverable, documents. By interpreting questions of waiver narrowly, the courts encourage litigants and their lawyers to err on the side of production (thereby serving the greater interests of justice by presenting a clearer picture of what actually happened) even when a plausible, though not compelling, argument could be made that the documents in question might be protectable by privilege or the work product doctrine. This consideration is particularly relevant to the case at bar in that counsel for Pac Bell stated on the record during the hearing on this matter that they (two lawyers) had not produced the documents in issue inadvertently or carelessly, but, instead, had studied the documents carefully and had concluded that they could not in good faith contend that the documents were protected by privilege or work product doctrine, even though the two lawyers recognized that they could have made a strained argument in support of such a position. In short, they decided to produce the documents rather than make a colorable but ultimately losing argument. In so

**2.** Even though plaintiff is not the holder of the privilege, because it is the party asserting its attachment and subsequent waiver, plaintiff, at a minimum, shares the burden of proving that all elements of the privilege attached in the first place. The proponent of the privilege carries the burden of establishing all elements of the privilege, including confidentiality, which is not presumed, and non-waiver. *Weil v. Investment/Indicators, Research & Management*, 647

F.2d 18, 24 (9th Cir.1981). In cases where the party seeking discovery is asserting that the privilege has attached, and then been waived, by the party resisting discovery, the burden of showing the existence of the privilege is, at best, apportioned between the parties. *Champion International Corp. v. International Paper Co.*, 486 F.Supp. 1328, 1330 n. 3 (1980); *Haglund v. Dow Chemical Co.*, 35 Fed.Rules Serv.2d 107, 109.

doing, they thought they were helping expedite the case development process. To understate the matter, we are reluctant to punish decisions of this kind.

Yet another reason for courts to respond cautiously to claims of waiver is to discourage the generally distracting and counterproductive temptation, to which lawyers in intellectual property cases seem especially vulnerable, to attempt to litigate (both in the pretrial phase and during trial) cases less through the substantive evidence than through the words and deeds of opposing counsel. It is not healthy for counsel to spend large percentages of their resources trying to learn what is in opposing counsel's files and mind. Instead, the judiciary should encourage counsel to focus their energies on explicating efficiently and accurately the facts and the law. All other things being equal, we should avoid generous constructions of the law of waiver because such constructions encourage diversion of counsel's attention away from the matters on which outcomes of cases ought to turn.

For all of the reasons set forth above, plaintiffs' motion to compel the further production of privileged documents relating to the subject matters covered by the defendants' communications with Mr. Wurman is DENIED.

### Discovery Cut–Off

The undersigned hereby RECOMMENDS to Judge Smith that the discovery cut-off date in this case, including discovery from experts, be extended to April 19, 1991.

### Rescheduling Status Conference

The undersigned hereby ORDERS that by March 14, 1991, the parties shall jointly contact Judge Smith's chambers to reschedule the status conference originally scheduled for March 7, 1991.

IT IS SO ORDERED AND RECOMMENDED.